# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-40495

United States Court of Appeals
Fifth Circuit

**FILED**
September 1, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

LAURO PABLO VALDEZ, JR.,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:17-CV-35

Before WIENER, ENGELHARDT, and OLDHAM, Circuit Judges.

KURT D. ENGELHARDT, Circuit Judge:

Defendant-Appellant Lauro Valdez, Jr., federal prisoner # 76629-080, appeals the denial of his 28 U.S.C. § 2255 motion to set aside his conviction for being a felon in possession of a firearm. Valdez advanced several grounds for relief in the district court, but this court granted a certificate of appealability as to only one: Valdez's claim that before he pleaded guilty, he received ineffective assistance of counsel because his trial attorney underestimated the range of imprisonment recommended by the United States Sentencing Guidelines ("Guidelines"). *United States v. Valdez*, No. 18-40495 (5th Cir. Feb. 28, 2019) (one-judge order). The evidence does not support Valdez's assertion

No. 18-40495

that there is a reasonable probability that he would not have pleaded guilty if he had been adequately counseled as to his actual Guidelines sentencing range, so we AFFIRM.

## I.     Background

After a jury was empaneled for his trial, Valdez pleaded guilty—with no plea agreement—to one count of possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  Valdez used the firearm to commit murder, so the Guidelines recommended a range of 324 to 405 months' imprisonment. Valdez's attorney estimated that his Guidelines range would be between twenty-four and thirty-three months, but the district court, after two colloquies pursuant to Fed.R.Crim.P. 11(b), accepted the guilty plea and sentenced Valdez to the statutory maximum term of 120 months in prison.

The conduct giving rise to Valdez's conviction took place in 2013, when Valdez shot and killed Marcelino Rodriguez outside of Valdez's home.  Video from a surveillance system that Valdez had installed showed Rodriguez approaching the house.  Rodriguez appeared to have something in his hand, but suspicion that it was a firearm was not borne out, as no such weapon was found near his body.  Rodriguez stopped outside of a metal gate positioned a few feet from Valdez's front door.  Valdez and his wife told officers after the shooting that Rodriguez was pounding on the gate and shouting that he was going to kill Valdez.  Valdez then retrieved a handgun from his bedroom and fired several shots at Rodriguez, knocking him down.  The video showed a bleeding Rodriguez on the ground outside the metal gate gesturing with empty hands.   Thirty-nine seconds after Rodriguez fell, Valdez walked up to Rodriguez—who at that point was lying on the ground about twelve feet from Valdez's front door—and fired three more rounds into him.

Valdez was arrested and charged in state court with murder.  While the state case was pending, Valdez was charged in federal court for being a felon

in possession of a firearm.[1]  In the federal matter, Valdez planned to assert a justification defense.  Someone had fired shots at Valdez's house ten days before the killing of Rodriguez, and Valdez claimed that he had received threatening phone calls.  Valdez argued that he was justified in possessing the firearm because, in the context of those prior incidents, he feared for his life when Rodriguez arrived outside his door and yelled threats.

Valdez decided to go to trial for the possession charge.  On October 19, 2015, after the jury had been selected, the district court conducted a hearing on whether to allow Valdez to assert the affirmative defense of justification at trial.  The court clarified that Valdez would not be permitted to raise his affirmative defense unless he could make a prima facie showing on all four elements[2] of justification.  As the court explained, the first element is that the Defendant was under an unlawful present, imminent, and impending threat of such a nature as to induce a well-grounded fear of death or serious bodily injury to himself or to a family member.  As to the "imminent and impending threat" element, the Government pointed out that Valdez possessed the gun well before Rodriguez arrived at the house, as evidenced by Valdez's wife's statement to the police that Valdez had placed the gun in his nightstand after the drive-by shooting ten days before the killing.[3]  The district court observed

---

[1] In 1997, Valdez pleaded guilty to conspiracy to possess with intent to distribute an excess of one hundred kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), a felony.

[2] To interpose a justification defense for his possession charge, Valdez was required to show (1) that he was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that he had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct; (3) that he had no reasonable, legal alternative to violating the law, both to refuse to do the criminal act and also to avoid the threatened harm; and (4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm. *United States v. Gant*, 691 F.2d 1159, 1162–63 (5th Cir. 1982).

[3] Valdez's attorney first insisted that Valdez's wife said that he had put the gun in the nightstand after the killing of Rodriguez, not after the earlier drive-by shooting of Valdez's

that, if Valdez's wife did say that he put the gun in his nightstand several days before the killing, that "in and of itself would be enough for a jury to find [Valdez] guilty of possession of a firearm by a convicted felon," because there would have been no imminent threat to Valdez during those few days prior to Rodriguez's appearance at Valdez's house, such that his possession of the weapon at that time could not be justified. Consequently, in light of his wife's anticipated testimony, Valdez's failure to meet the "imminent and impending threat" element would bar him from presenting the defense of justification. Because of the critical nature of Valdez's wife's statement, the hearing paused for Valdez's counsel to confer with her in person regarding what she had told the police. When he returned, Valdez's counsel confirmed, unfortunately for his client, that Valdez's wife did in fact tell officers that Valdez had put the gun in the nightstand well before the killing. Counsel, apparently acknowledging the damning nature of this evidence in the eyes of a jury, informed the court that he was now considering a late plea because the evidence, once revealed, "would change everything."

After the wife's statement had come to light and after conferring with his counsel, Valdez then, before the district court officially ruled on any pretrial motions, sought to change his plea to guilty. The court specifically noted that only his sentence and any § 2255 issues would be appealable, and his counsel confirmed that was correct. During the Rule 11 colloquy, the district court told Valdez, appropriately, correctly, and expressly, that

> right now you don't know what sentence I would give you, I don't know what sentence I would give you and I don't know that because a Probation officer has to meet with you, your lawyer gets to be present and they have to give me a report about your criminal

---

home. The attorney then admitted to not having watched the video or read the report of the wife's statement to police.

history and then they've got to give me a report about this case and where you score.

Valdez initially said that his attorney had not reviewed the Guidelines with him, but after being shown a copy of the manual, he said that he was familiar with them. The court thoroughly explained how the Guidelines arrive at a recommended sentence, noted clearly that the court had the power to sentence *above* or *below* that range, and stated the factors that the court must consider when choosing a sentence. The court asked, "Are you aware of the penalties?" to which Valdez replied, "Yes, ma'am." The court then explained that the statutory maximum penalty was ten years in prison. Valdez again said that he understood and that he had no questions about the penalty. The court explicitly addressed the issue of an estimated sentence, including one from Valdez's counsel:

> And this is important because I will tell you that [your attorney] may have given you a good faith estimate where he thinks you may fall in that chart and -- and he may tell you, "You know, I've been in front of this Judge a lot of times, I think she may or may not do this," but at the end of the day *he really has no idea and you really have no idea and I have no idea because I don't know where you're going to score and I don't know everything about your life history, and so whatever your lawyer may have said to you is not a promise, it's not a guarantee and it's not binding on this Court.* Do you understand that? (emphasis added)

Valdez said, "Yes, ma'am," and confirmed that he wanted to proceed with pleading guilty.

The hearing continued to the next day, October 20, 2015, when the district court again confirmed that Valdez understood that he could not withdraw his guilty plea if he was unhappy with the sentence he received. The court then gave Valdez a chance to withdraw his plea. He declined, and the court accepted Valdez's plea of guilty.

The district court determined that the Guidelines recommended a range of imprisonment of 324 to 405 months.  Valdez had a criminal history category of II, which the district court found significantly underrepresented Valdez's criminal activity.  The district court determined that Valdez's base offense level was forty-three because he committed first degree murder when he waited almost forty seconds after Rodriguez fell to the ground and then walked out of his house and shot Rodriguez three more times.  The court then applied a three-level reduction for acceptance of responsibility.

Under the Guidelines, when a firearm is possessed or used in connection with another offense that results in death, the base offense level for illegal possession of that firearm is taken from the homicide subpart of the Guidelines that is most analogous to the conduct, if the resulting offense level is greater than it would be otherwise.  U.S. SENTENCING GUIDELINES MANUAL § 2K2.1(c)(1) (U.S. SENTENCING COMM'N 2015).  First degree murder results in an offense level of forty-three, second degree murder an offense level of thirty-eight, voluntary manslaughter an offense level of twenty-nine, and involuntary manslaughter an offense level of twelve to eighteen.  *Id.* §§ 2A1.1, 2A1.2, 2A1.3, 2A1.4.

Despite the video evidence and undisputed facts, Valdez urged the district court not to apply the homicide cross-reference because he had not been convicted of homicide in state court, making the base offense level twenty.  That would have resulted in a Guidelines range of twenty-seven to thirty-three months of imprisonment after a three-level reduction for acceptance of responsibility.  *See Id.* Ch. 5, Pt. A.  The court overruled Valdez's objection to the cross-reference and sentenced him to the statutory maximum term of 120 months in prison.  The court observed that, although it found that Valdez committed first degree murder, the Guidelines recommendation would also have exceeded the statutory maximum if Valdez had only committed second

degree murder. Important to the issue raised here, the district court further explained that even if it had not used a first or second degree murder application to calculate the Guidelines range, the court would have relied on Valdez's extensive and underrepresented criminal history to vary upwards to the maximum sentence of 120 months.

Valdez then filed a motion under 28 U.S.C. § 2255, seeking to set aside his conviction. Valdez originally asserted several grounds for relief but has since abandoned all but one: that his trial counsel was ineffective in substantially underestimating Valdez's Guidelines range and therefore failing to advise Valdez that he faced a significant risk of receiving the statutory maximum term of imprisonment. Valdez alleged in his sworn § 2255 motion, and in a subsequent amendment, that his attorney did not tell him about the cross-reference provision of the Guidelines and instead advised that his Guidelines range was either twenty-four to thirty months, according to the original motion, or twenty-seven to thirty-three months, according to the amended motion. Contrary to the colloquy on the record, Valdez alleged that, "[he] did not know that he could be sentenced to the maximum penalty of 10 years if the Court found that he committed murder in the first degree, murder in the second degree, or voluntary manslaughter," and that, "[i]f Movant [had] been aware of the aforementioned provisions of the Guidelines, he would not have waived his right to a jury trial, because he had a viable defense." Valdez's trial counsel submitted an affidavit stating that he "informed him of the guideline levels" and the statutory maximum of ten years but admitting that he did not inform Valdez that the base offense level could be forty.

The district court denied Valdez's § 2255 motion. As to the issue now on appeal, the district court found that Valdez understood that he faced a maximum possible sentence of 120 months, and there was no evidence that his counsel promised him a particular sentence. With that understanding, the

court reasoned, Valdez could not show that he was prejudiced by ignorance of section 2K2.1(c)(1)(B)'s potential application before his decision to plead guilty.

## II.     Standard of Review

In the appeal of a denial of a § 2255 motion, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Clay*, 921 F.3d 550, 554 (5th Cir. 2019), *as revised* (Apr. 25, 2019). "A district court's conclusions concerning a § 2255 petitioner's claims of ineffective assistance of counsel involve mixed questions of fact and law, which we review de novo." *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002).

## III.     Analysis

To prevail on an ineffective assistance of counsel claim, a defendant must satisfy the test from *Strickland v. Washington*, 466 U.S. 668 (1984), by showing that (1) his "counsel's performance fell below an objective standard of reasonableness," and (2) that his counsel's deficient performance caused him prejudice. *United States v. Grammas*, 376 F.3d 433, 436 (5th Cir. 2004). "To prove prejudice, the defendant must show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bass*, 310 F.3d at 325 (quoting *Strickland*, 466 U.S. at 694). In the context of a guilty plea, that means there is a reasonable probability that the defendant "would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also Young v. Spinner*, 873 F.3d 282, 285 (5th Cir. 2017).

This inquiry "focuses on a defendant's decisionmaking." *Lee v. United States*, 137 S. Ct. 1958, 1966–67 (2017). "When a defendant alleges his counsel's deficient performance led him to accept a guilty plea rather than go to trial, we do not ask whether, had he gone to trial, the result of that trial 'would have been different' than the result of the plea . . . ." *Id.* at 1965. Of course, in many cases a defendant's prospects at trial are relevant to whether

he or she would have gone to trial instead of pleading guilty. *See Hill*, 474 U.S. at 59 ("[For example,] where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial."). "But that is not because the prejudice inquiry in this context looks to the probability of a conviction for its own sake. It is instead because defendants obviously weigh their prospects at trial in deciding whether to accept a plea." *Lee*, 137 S. Ct. at 1966. Finally, "[c]ourts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id*. at 1967; *see also Young*, 873 F.3d at 286. Factors relevant to determining whether a defendant would have gone to trial can also include "the risks [he] would have faced at trial," "his 'representations about his desire to retract his plea,'" and "the district court's admonishments." *United States v. Batamula*, 823 F.3d 240 n.4 (5th Cir. 2016) (quoting *United States v. Kayode*, 777 F.3d 719, 725 (5th Cir. 2014)).

Valdez argues that he satisfies the first prong of *Strickland* because his counsel's performance was unreasonably deficient. Counsel underestimated Valdez's Guidelines range by failing to consider the cross-reference provision of section 2K2.1(c)(1). *See Grammas*, 376 F.3d at 437. Based on that miscalculation, counsel estimated that his Guidelines range would likely be less than a quarter of the statutory maximum. But Valdez's counsel did advise Valdez of the 10-year statutory maximum, which of course he was earlier advised of in open court at his arraignment. Despite his counsel's underestimation of his Guidelines range, Valdez falls short of demonstrating an unreasonable deficiency.

No. 18-40495

In *Strickland*, the Supreme Court emphasized that the Sixth Amendment does not set forth particular requirements of effective assistance. *See Strickland*, 466 U.S. at 688. Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* The Court goes on to say that although representation of a criminal defendant entails certain basic duties, these basic duties "neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance." *Id.* at 688. The Court reasons that judicial scrutiny of counsel's performance must be "highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after . . . [an] adverse sentence, and it is all too easy for a court . . . to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. In essence, the Sixth Amendment entitles a criminal defendant to *reasonable*, but not *perfect*, representation of counsel.

In addition, it is axiomatic that post-*Booker*, the application of the Guidelines to a sentence is discretionary, and the court is entitled to impose a variance outside the Guidelines range. *See Gall v. United States*, 552 U.S. 38, 46–51 (2007). The court is obligated to calculate and consult the Guidelines range but may use departures up or down from that range, or even jump the Guidelines and impose a variance if consideration of other factors so warrants. *See id.* at 53–56.

Here, although Valdez's counsel's estimate of what he "hoped" Valdez's sentence would be was well below the 120 months to which Valdez was ultimately sentenced, counsel properly apprised Valdez, prior to his pleading guilty, of the maximum penalty the court could impose. And counsel also made abundantly clear to Valdez that no estimation he offered was a guarantee or a promise. It is no doubt that counsel's estimated sentencing range was far lower

No. 18-40495

than Valdez's actual sentence. Nevertheless, we do not find any deficiency in counsel's estimation to be unreasonable.[4]

Moreover, on this record, Valdez has not shown any deficiency caused him prejudice. Valdez contends that there is a reasonable probability that he would have continued with his trial if he had known that the cross-reference provision of the Guidelines created a real risk of receiving the statutory maximum term of imprisonment. Valdez argues that his contemporaneous actions in proceeding with jury selection indicate that he would prefer the jury to hear the evidence and render a verdict. Indeed, at the time he pleaded guilty, the jury had already been selected and empaneled, and the presentation of evidence in the case was to begin the next morning.[5]

However, Valdez and his counsel then learned of the district court's strong inclination to disallow his defense of justification, based on the expected testimony of his wife to officers that Valdez was in possession of her gun several days before he used it to kill Rodriguez—all of which defense counsel confirmed. In other words, the fortunes of going to trial changed dramatically, literally overnight, such that Valdez's conviction was imminent. This drastic change in circumstances significantly undercuts Valdez's contention that he would have gone to trial but for his counsel's erroneous sentence estimation. *Cf. Lee*, 137 S. Ct. at 1966 ("Where a defendant has no plausible chance of an

---

[4] The dissenting opinion contends that counsel's performance is unreasonable because his misestimation stemmed from his ignorance of a "plainly obvious provision." Yet, it is not at all uncommon for a cross-reference to be overlooked. The U.S.S.G. Manual contains so many cross-references that *all* involved in the calculation frequently miss them: the Probation Office, defense attorneys, prosecutors, even the district court judge. But *Strickland* does not dictate that missing a single cross-reference in the U.S.S.G. is *so* deficient that it is *constitutionally* deficient. And it is inconceivable that a Sixth Amendment violation occurs when counsel performs with anything less than mathematical precision in navigating a manual that routinely generates reversible plain error in our court.

[5] Valdez also asserts that he previously declined the Government's offer of a plea agreement, although its contents are not known.

acquittal at trial, it is highly likely that he will accept a plea if the Government offers one."). The more obvious explanation for his late plea is made clear at this juncture in the proceedings: rather than risk conviction by the jury (with no sentencing benefits whatsoever), Valdez and his counsel hoped to parlay a late guilty plea into a credit for acceptance of responsibility and his new-found desire to cooperate or render substantial assistance, perhaps a more promising opportunity. The record supports this strategic decision of weighing great risk of conviction and an unavoidable statutory maximum sentence versus entering the guilty plea and then seeking reduction to a sentence with mitigating factors that could come with the guilty plea. *See Lee*, 137 S. Ct. at 1966 ("[A] defendant facing such long odds will rarely be able to show prejudice from accepting a guilty plea . . . .").

Furthermore, Valdez was clearly aware that the maximum possible prison term was 120 months, even though he and his attorney were operating with the understanding that the Guidelines with a plea would suggest a significantly lower sentence. Valdez and his attorney both agree that they never discussed the cross-reference provision of the Guidelines, and Valdez's attorney does not dispute that he told Valdez that his Guidelines range would likely be between twenty-four and thirty-three months. Valdez's counsel rationalized pleading guilty before receiving likely adverse key pretrial rulings, and thereby preserving an appeal only as to the sentence, by saying, "we've looked at it and his sentence, hopefully, wouldn't be that much." But Valdez and his attorney knew full well the circumstances of the charge against him, including most significantly the use of the subject firearm to murder Rodriguez, the video showing Valdez shooting Rodriguez point blank three more times, as well as Valdez's significant criminal history aside from this incident. It came as no surprise to the defendant or his counsel that the district court would indeed factor in all of the circumstances in determining a sentence,

whether after trial or following a guilty plea. *See Lee*, 137 S. Ct. at 1966 ("The decision whether to plead guilty also involves assessing the respective consequences of a conviction after trial and by plea.").

Valdez himself clearly and unequivocally stated, under oath, that he understood that the maximum penalty was 120 months, his attorney's estimate of his sentence could be wrong, was not a "promise" or "guarantee," was "not binding on this Court," and the application of any reduction for an acceptance of responsibility was entirely up to the court. *See Lee*, 137 S. Ct. at 1967 (noting courts should use "contemporaneous evidence" to substantiate a defendant's claims). Indeed, the district court points to *United States v. Cogdell*, 608 F. App'x 241 (5th Cir. 2015) as a case that presents similar circumstances, in that the defendant alleged prejudice because he was ignorant of a career-offender enhancement. There, our court found that

> the district judge conducted a thorough colloquy at the rearraignment hearing, explaining that the sentence would depend on calculations under the Sentencing Guidelines and that the court, regardless of the Guidelines, was free to sentence Cogdell up to 40 years. Even if it were assumed that Cogdell was ignorant of the career-offender enhancement, he "understood the length of time he might possibly receive, [and therefore] he was fully aware of his plea's consequences."

*Id.* (citing *Barbee*, 678 F.2d at 635.). Likewise, as set forth herein, Valdez's argument fails on the prejudice prong under *Strickland*. Valdez was clearly advised—multiple times—by both the court and his counsel of the maximum sentence he could receive, such that he was "fully aware of his plea's consequences." *See id.* And Valdez's statements at the colloquy, wherein he confirms his understanding of these consequences, serve as evidence relevant

No. 18-40495

to understanding his decision-making at the time.[6]  *See United States v. Lampazianie*, 251 F.3d 519, 524 (5th Cir. 2001) (holding that sworn statements at a plea hearing are entitled to a strong presumption of truthfulness).

This is not to say that every defendant whose attorney makes an error in estimating his Guidelines range has not suffered prejudice.[7]  But, in this instance, Valdez has not shown that his counsel's estimation of the applicable Guidelines range alone caused him to plead guilty.  Rather, the record indicates that Valdez's decision to plead guilty at the eleventh hour was logically motivated by the exposure of evidence which proved fatal to his affirmative defense, all but guaranteeing a conviction at trial, without any possible sentencing benefits he knew might be available with a plea of guilty.

Accordingly, the judgment of the district court is AFFIRMED.

---

[6] The dissent asserts that "[a]t the very least," the district court should have conducted an evidentiary hearing.  But Valdez failed to raise that argument in his opening brief; therefore, he has forfeited the issue on appeal. *See United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir.), cert. denied, ---U.S.----, 136 S.Ct. 2477, 195 L. Ed. 2d 812 (2016).

[7] The dissent suggests that our holding today stands for the proposition that a defense attorney discharges his duty by merely informing his client of the statutory maximum sentence.  Not so.  We are holding, though, that under the particular facts of this case, defense counsel's performance was not constitutionally deficient.

No. 18-40495

WIENER, Circuit Judge, dissenting:

I respectfully dissent in the belief that Valdez has satisfied both prongs of *Strickland* and that the majority deeply undermines the Sixth Amendment's guarantees in contemporary criminal defense by rendering counsel's familiarity with the Sentencing Guidelines optional when advising a client of the consequences of a guilty plea.

With respect to *Strickland's* first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."[1] The Guidelines, even though discretionary, play such an important role in federal criminal defense that it is unreasonable for counsel to make a grossly inaccurate estimate of the applicable sentencing range because of his ignorance of basic Guidelines provisions or failure to make a good faith attempt at a proper calculation.

The Guidelines are the "lodestone of sentencing," for "they remain the starting point for every sentencing calculation in the federal system."[2] "Even after *Booker* rendered the Sentencing Guidelines advisory, district courts have in the vast majority of cases imposed either within-Guidelines sentences or sentences that depart downward from the Guidelines on the Government's motion."[3] And when a "sentencing judge sees a reason to vary from the Guidelines, 'if the judge uses the sentencing range as the beginning point to explain the decision to deviate from it, then the Guidelines are in a real sense the basis for the sentence.'"[4] "That a district court may ultimately sentence a

---

[1] Padilla v. Kentucky, 559 U.S. 356, 366 (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)).

[2] Peugh v. United States, 569 U.S. 530, 542, 544 (2013).

[3] *Id.* at 543–44.

[4] *Id.* at 542 (quoting Freeman v. United States, 564 U.S. 522, 529 (2011) (plurality opinion)).

given defendant outside the Guidelines range does not deprive the Guidelines of force as the framework for sentencing."[5]

Because of the importance of sentencing guidelines in contemporary criminal practice, professional standards for defense counsel repeatedly emphasize that defense counsel must be familiar with the law and procedures applicable to sentencing, including any applicable sentencing guidelines. Such standards can inform the attorney conduct that is reasonable.[6] "Although they are 'only guides,' . . . and not 'inexorable commands,' . . . these standards may be valuable measures of the prevailing professional norms of effective representation . . . ."[7]

The American Bar Association, for example, states that in reference to plea agreements, "Defense counsel should investigate and be knowledgeable about sentencing procedures, law, and alternatives, collateral consequences and likely outcomes, and the practices of the sentencing judge, and advise the client on these topics before permitting the client to enter a negotiated disposition."[8] At sentencing, "[d]efense counsel should become familiar with . . . applicable sentencing laws and rules" by "learning the . . . the normal pattern of sentences for the offense involved, including any guidelines applicable for . . . sentencing."[9] Similarly, the National Legal Aid and Defender Association Performance Guidelines for Criminal Defense Representation advise that "[c]ounsel should be familiar with the sentencing provisions and

---

[5] *Id.*

[6] *Strickland*, 466 U.S. at 688–89.

[7] *Padilla*, 559 U.S. at 367 (quoting *Strickland,* 466 U.S. at 688; *Bobby v. Van Hook,* 558 U.S. 4, 8 (2009))

[8] CRIMINAL JUSTICE STANDARDS FOR THE DEF. FUNCTION § 4-6.3 (AM. BAR ASS'N 4th ed. 2017).

[9] *Id.* § 4-8.3.

options applicable to the case, including . . . any sentencing guideline structure."[10]

Recognizing the importance of the Guidelines in the sentencing process, several other circuit courts require defense counsel to make a minimally competent Guidelines estimate, or at least a good faith attempt. They do so, for the most part, even in the era of advisory Guidelines, and so by implication hold that defense counsel does not discharge his duty by merely informing his client of the statutory maximum sentence.

In the D.C. Circuit, "a lawyer who advises his client whether to accept a plea offer falls below the threshold of reasonable performance if the lawyer makes a 'plainly incorrect' estimate of the likely sentence due to ignorance of applicable law of which he 'should have been aware.'"[11]

In the Sixth Circuit, "[c]ompetent representation . . . demands that counsel explore the range of penalties a defendant is facing under likely guidelines calculation scenarios as completely as possible. 'The failure of defense counsel to "provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance.""'[12] The

---

[10] PERFORMANCE GUIDELINES FOR CRIMINAL DEF. REPRESENTATION § 8.2(a)(1) (NAT'L LEGAL AID AND DEF. ASSN. 1995).

[11] United States v. Booze, 293 F.3d 516, 518 (D.C. Cir. 2002) (quoting United States v. Gaviria, 116 F.3d 1498, 1512 (D.C. Cir. 1997)); *see also* United States v. Hanson, 339 F.3d 983, 990 (D.C. Cir. 2003) (holding that failure to apply career offender enhancement in making Guidelines estimate was deficient, but finding no prejudice); United States v. Caso, 723 F.3d 215, 224 n.7 (D.C. Cir. 2013) (commenting in the context of whether the statutory maximum or Guidelines range should be used to determine the seriousness of an offense that "our cases have made clear that a defense counsel's conduct may be constitutionally deficient if counsel fails to advise his client of the correct Guidelines range he would face upon taking a plea").

[12] Thompson v. United States, 728 F. App'x 527, 533 (6th Cir. 2018) (quoting Smith v. United States, 348 F.3d 545, 553 (6th Cir. 2003)); *see also* United States v. Morris, 470 F.3d 596, 603 (6th Cir. 2006) (holding that state defense counsel was ineffective in relying on prosecutor's representation of federal sentencing guidelines range rather than conducting an independent analysis).

court in *Thompson v. United States* held that counsel might have been deficient when he knew that shots had been fired at officers during a police chase but failed to take that into account in estimating his client's Guidelines range.[13]

The Seventh Circuit held that a defendant deserved an evidentiary hearing by alleging that counsel overestimated the Guidelines range because he failed to realize that the state conviction on which a recidivist enhancement was based did not actually qualify.[14] Competent performance "would have required little more than reading the Indiana statute and the provisions it cross-referenced, and comparing them to the federal definition of felony drug offense."[15]

The Ninth Circuit ruled that "counsel's failure to anticipate that the offenses would be grouped for sentencing purposes and then advise [the defendant] to move to withdraw his agreement to plead guilty was constitutionally deficient."[16] The court reasoned that, "[t]hough a mere inaccurate prediction, standing alone, would not constitute ineffective assistance, the gross mischaracterization of the likely outcome. . . , combined with the erroneous advice on the possible effects of going to trial, falls below the level of competence required of defense attorneys."[17] Counsel's error "was not a minor technical error, but rather . . . had major impact on the calculation of the discretionary Sentencing Guidelines."[18]

---

[13] *Thompson*, 728 F. at 533–34.

[14] Brock-Miller v. United States, 887 F.3d 298, 310 (7th Cir. 2018).

[15] *Id.*; *see also* United States v. Barnes, 83 F.3d 934, 940 (7th Cir. 1996) ("A defendant can prove that his attorney's performance was deficient if he shows that his attorney did not make a good-faith effort to discover the facts relevant to his sentencing, to analyze those facts in terms of the applicable legal principles and to discuss that analysis with him.").

[16] United States v. Manzo, 675 F.3d 1204, 1209–10 (9th Cir. 2012).

[17] *Id.* (quoting Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986)).

[18] *Id.*

In the Tenth Circuit, "[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance arising to the level of ineffective assistance of counsel[, but] counsel's failure to understand the basic structure and mechanics of the sentencing guidelines can rise to deficient performance under *Strickland*."[19]

Finally, there is some support in Fifth Circuit precedent too. In *United States v. Rivas-Lopez*, the defendant alleged that "counsel's calculation of the Guidelines range for the plea offer significantly overstated [the defendant]'s actual sentencing exposure" when counsel said the Guidelines range would be 262 to 327 months and it was actually 87 to 108 months.[20] The Guidelines were merely advisory in *Rivas-Lopez*, although defense counsel might or might not have advised the client that there was a mandatory minimum.[21] This court held that such allegations did not "conclusively show that the prisoner is entitled to no relief" and remanded for an evidentiary hearing.[22]

In *United States v. Scribner*, the Government conceded that counsel was deficient for failing to advise the defendant that the career-offender enhancement might apply, but this court held that there was no prejudice because the evidence showed that the defendant would still have gone to trial even if he had known about the longer Guidelines range.[23] And in *United States v. Smith*, this court held that counsel's failure to object to the district court's incorrect calculation of the guidelines range was a deficient performance.[24]

---

[19] United States v. Parker, 720 F.3d 781, 788 n.9 (10th Cir. 2013) (quotations and citations removed).

[20] United States v. Rivas-Lopez, 678 F.3d 353, 358 (5th Cir. 2012).

[21] *See id.* at 358–59.

[22] *Id.* at 359.

[23] United States v. Scribner, 832 F.3d 252, 256 (5th Cir. 2016).

[24] United States v. Smith, 454 F. App'x 260, 261 (5th Cir. 2011) (unpublished); *see also* United States v. Franks, 230 F.3d 811, 814 (5th Cir. 2000) (holding, under mandatory Guidelines, that counsel's failure to object to the district court double-counting in its Guidelines calculation was deficient).

No. 18-40495

There is no binding Fifth Circuit precedent holding the inverse, i.e., that informing a defendant of the maximum sentence renders counsel's otherwise erroneous Guidelines calculation reasonable under *Strickland*. In *United States v. Valdez*, this court rejected a defendant's claim that counsel was ineffective for failing to advise him that he could be sentenced as a career offender.[25] We held that, even if counsel failed to advise the defendant of his "true sentencing exposure," the defendant "understood the consequences of pleading guilty" because he knew the statutory maximum sentence.[26] To support that proposition, this court cited only to *United States v. Rivera*, which held that the Guidelines themselves do not violate the Sixth Amendment by making it impossible for counsel to predict an exact sentence.[27] Reading *Valdez* to hold that counsel has no obligation to inform a defendant of anything but the maximum possible sentence would run counter to at least one Supreme Court holding.[28] And it would deviate from the general principle in *United States v. Rivas-Lopez*, that "[w]hen considering whether to plead guilty or proceed to trial, a defendant should be aware of the relevant circumstances and the likely consequences of his decision so that he can make an intelligent choice."[29] The reasoning in *Valdez* seems to fit better within the prejudice prong of *Strickland*. The court's wording on the first prong stopped short of explicitly holding that counsel's performance was not deficient, and the court went on to hold that there was no prejudice anyway.[30] Therefore, in addition to being nonbinding, *Valdez* is arguably silent on the deficiency issue.

---

[25] United States v. Valdez, 578 F. App'x 366, 367 (5th Cir. 2014) (unpublished).

[26] *Id.*

[27] United States v. Rivera, 898 F.2d 442, 447 (5th Cir. 1990).

[28] *See Padilla*, 559 U.S. at 360 (counsel must inform defendant when pleading guilty would make deportation "practically mandatory").

[29] *Rivas-Lopez*, 678 F.3d at 356–57.

[30] *Valdez*, 578 F. App'x at 367.

20

The consistent theme in the foregoing decisions is that defense counsel's performance in making a Guidelines calculation is unreasonable under prevailing professional norms when, because of his ignorance of basic Guidelines provisions, counsel makes an error of significant magnitude. And that is precisely what happened here.

Counsel had to do "little more than read[]" the Guidelines to avoid a "plainly incorrect" estimate.[31] The cross reference provision at issue appears in the same section that establishes the base offense level for Valdez's crime.[32] Counsel did not need to know of its existence independently; he needed only to have continued reading the three-page section. Neither is the import of the cross reference subtle. It plainly instructs that, "if death resulted, [apply] the most analogous offense guideline from Chapter Two, Part A, Subpart 1 (Homicide), if the resulting offense level is greater than that determined above."[33]

Not only did counsel fail to read and comprehend the plain language of the cross reference: He also exhibited a "failure to understand the basic structure and mechanics of the sentencing guidelines" that led to a "major impact on the calculation of the discretionary [s]entencing" range.[34] Counsel entirely failed to advise Valdez that he could effectively be sentenced for murder. That led, in turn, to an underestimation of his Guidelines range by a factor of ten! Valdez's counsel never offered even a colorable justification for believing that the district court could not or would not consider the homicide in sentencing Valdez for the possession of a firearm; the district court admonished counsel to refrain from making frivolous arguments for why the

---

[31] *Brock-Miller*, 887 F.3d at 310; *Booze*, 293 F.3d at 518.

[32] *See* U.S. SENTENCING GUIDELINES MANUAL § 2K2.1 (U.S. SENTENCING COMM'N 2015).

[33] U.S.S.G. § 2K2.1(c)(1)(B).

[34] *Parker*, 720 F.3d at 788 n.9; *Manzo*, 675 F.3d at 1209–10.

cross reference should not apply. The fact that the calculation of a sentencing range may consider all relevant conduct related to the offense, including even crimes of which a defendant has been acquitted, is a fundamental feature of the Guidelines. Ignorance of such basic workings of the federal sentencing scheme is legally unreasonable.

Furthermore, counsel's error's genesis in ignorance and lack of diligence blunts the majority's concern about "second-guess[ing]" counsel. The Supreme Court in *Strickland* was especially concerned about courts overturning convictions when, in hindsight, counsel's *strategy* proved ineffective.[35] The Court required that petitioners "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[36] It imposed a presumption that counsel's actions "might be considered sound trial strategy."[37]

Here, however, there is no question of strategy whatsoever. Counsel did not make an erroneous but professionally reasonable judgment about whether to apply the Guidelines' cross reference provision in calculating Valdez's sentencing range. Instead, he entirely failed to notice or engage with the provision at all. Counsel was deficient because he did not exercise basic diligence in advising Valdez about the sentencing scheme that he was facing.

The Sentencing Guidelines play too central a role in contemporary criminal defense for counsel's obligation to begin and end with informing his client of the statutory maximum sentence. When, as here, counsel grossly misestimates a Guidelines calculation because of ignorance of a plainly obvious provision, counsel's performance is unreasonable under the first prong of

---

[35] *See Strickland*, 466 U.S. at 688–90.
[36] *Id.* at 690.
[37] *Id.* at 689.

*Strickland*. To hold otherwise, as does the majority, empties *Strickland's* protections of any real meaning in the context of the Guidelines.

Valdez also satisfies the second prong of *Strickland*: He has shown a reasonable probability that, had he been correctly informed of the impact of the cross reference on the Guidelines calculation, he would not have pleaded guilty. The majority applies essentially three rationales for concluding that Valdez would have pleaded guilty even if he had known the correct Guidelines range: (1) After his chances of success at trial were drastically narrowed, Valdez made a strategic choice to plead guilty to mitigate his sentence; (2) Valdez knew that, when selecting a sentence, the district court judge would consider that he had killed someone; and (3) Valdez was fully aware of his plea's consequences because he knew that he could be sentenced to ten years.

With respect to the first rationale, the majority ignores the fact that counsel's error led Valdez to believe that there were benefits to pleading guilty that did not actually exist under the correct Guidelines calculation. According to the advice that Valdez received from his counsel, a three-level reduction for acceptance of responsibility would have decreased Valdez's Guidelines range from thirty-seven to forty-six months to twenty-seven to thirty-three months, shaving about a year off of a three-to-four-year sentence if it were to be applied. On the other hand, under a proper reading of the Guidelines, if Valdez were found to have committed first or second degree murder, there would be no benefit from the reduction for acceptance of responsibility because the reduced Guidelines range would still entirely exceed the statutory maximum.

Had Valdez understood the truth about his Guidelines sentence recommendation, he would have known that the only benefit to pleading guilty was preserving the possibility of receiving a reduction for acceptance of responsibility in the unlikely event that the court should conclude that he did not commit murder. In exchange, he gave up the possibility that (1) the court

would allow his defense of justification to go to a jury, and (2) a jury would acquit him, with or without the justification defense.[38] The chance of acquittal was small, but when the consequences of a conviction after trial and plea "are, from the defendant's perspective, similarly dire, even the smallest chance of success at trial may look attractive."[39] Counsel's error hid from Valdez both the magnitude of the consequences he faced and the narrowness of any possible benefit from pleading guilty. There is no doubt that, as the majority reasons, Valdez pleaded guilty at the last minute because of the change in circumstances when he learned of his wife's statements to the police.[40] But he did so in the belief that the Guidelines afforded him a chance at a reduction for taking responsibility when they realistically did not.

With respect to the second rationale, the contemporaneous evidence suggests exactly the opposite of that which the majority concluded: Because of the erroneous advice of his counsel, Valdez did *not* know that he would effectively be sentenced for murder. There is no evidence that Valdez's counsel ever told him that the court would even consider Valdez's killing a man when deciding the sentence for possessing a firearm. And neither did the district court ever mention it during the colloquy. Instead, the district court repeatedly emphasized to Valdez and his counsel that the firearms charge was entirely separate from the state murder charge. The court said, for example, "[H]e's not

---

[38] *Cf.* Young v. Spinner, 873 F.3d 282, 287 (5th Cir. 2017) (denying habeas petition for relief from state conviction when defendant "had little to gain and much potentially to lose" from going to trial and thus was unlikely to have actually decided not to plead guilty).

[39] Lee v. United States, 137 S. Ct. 1958, 1966 (2017) (vacating guilty plea when, even though defendant would "almost certainly" be deported if he went to trial, it was his only way to avoid certain deportation after pleading guilty).

[40] The majority suggests that Valdez must show that "counsel's estimation of the applicable Guidelines range alone caused him to plead guilty." Neither *Strickland* nor any other precedent imposes a sole causation requirement on counsel's ineffectiveness. *See Strickland*, 466 U.S. at 694. Valdez need only show that, had counsel given him a reasonable estimate of his Guidelines range, there is a reasonable probability that he (Valdez) would have gone to trial. *Id.*

before the Court on the murder charge, you'll have to deal with that with the State when the State goes forward with that." And, "You're not before me on the murder charges, I have nothing to do with what the State will or will not do to you other than, I guess, one caveat, I can order that whatever sentence I give to you run consecutive to . . . whatever happens to you over there." And, "This is felon in possession of a firearm, that's murder. They're separate crimes . . . ." And, "[T]hey are separate crimes, they're separate matters altogether . . . ." All of that is true, of course. But from Valdez's perspective, it could have appeared consistent with the erroneous advice received from counsel that he would not be effectively sentenced for murder on the federal firearms charge.

The third rationale—that Valdez was fully aware that he could be sentenced to ten years—is certainly some contemporaneous evidence that Valdez would still have pleaded guilty even if he knew that his Guidelines range was well above ten years. But it is not dispositive. The Supreme Court's reasoning in *Peugh v. United States* is helpful here too.[41] Despite the advisory nature of the Guidelines, "the defendant will be aware that the range is intended to, and usually does, exert controlling influence on the sentence that the court will impose."[42] None of Valdez's statements at the colloquy need be false to conclude that there is a reasonable probability that he would not have pleaded guilty if he had known about the cross reference provision. It is perfectly rational for a defendant to rely on his counsel's estimation of his Guidelines range when weighing the pros and cons of pleading guilty, even while knowing that the estimate could be wrong and is not binding on the court.

---

[41] *Peugh*, 569 U.S. at 545 (Sotomayor, J. concurring).
[42] *Id.*

No. 18-40495

The district court was wrong to treat Valdez's awareness of the statutory maximum penalty as the end of the inquiry; the appellate majority veers perilously close to doing so as well. Limiting the prejudice inquiry to the plea colloquy is inconsistent with the Supreme Court's direction that whether "a plea is knowing and voluntary . . . is not the correct means by which to address a claim of ineffective assistance of counsel."[43] For that very reason, the Supreme Court has "also rejected the argument . . . that a knowing and voluntary plea supersedes errors by defense counsel."[44]

That *United States v. Cogdell* terminates its analysis at the defendant's knowledge of the statutory maximum is not persuasive.[45] There, the defendant "offer[ed] only his bare assertion that he was unaware of the sentencing consequences of his plea. But he neither sa[id] that counsel misled him nor attempt[ed] to explain how counsel performed deficiently."[46] There was, therefore, nothing beyond the colloquy for the court to analyze. Here, by contrast, Valdez has shown that his counsel affirmatively misled him about the likely consequences of his plea: Valdez was very likely to receive the statutory maximum rather than the two to three years that counsel advised. There was little chance that pleading guilty would confer any advantage because the reduction for acceptance of responsibility would be absorbed by the Guidelines range for several levels of homicide. If *Cogdell* says anything more than that a defendant cannot show prejudice when he knows the statutory maximum and has no explanation for how he was misled, it would contradict the requirement in *Lee v. United States*, that the prejudice inquiry "demands

---

[43] Lafler v. Cooper, 566 U.S. 156, 173 (2012).
[44] Missouri v. Frye, 566 U.S. 134, 141 (2012) (discussing holding in *Padilla*, 559 U.S. at 374, that counsel must advise defendant whether a plea carries the risk of deportation).
[45] United States v. Cogdell, 608 F. App'x 241, 242 (5th Cir. 2015).
[46] *Id.* at 241–42.

a case-by-case examination of the totality of the evidence . . . focus[ed] on a defendant's decisionmaking."[47]

Considering (1) the unique (if unintentional) way in which Valdez's counsel misled him to believe there were likely benefits to pleading guilty, (2) that Valdez was ready to go to trial, and (3) that Valdez (and his counsel) appeared to be operating with the understanding that the Guidelines would recommend a significantly lower sentence, Valdez has shown that there is a reasonable probability that he would have gone to trial if he had been given a competent Guidelines estimate.

At the very least, Valdez has shown enough to merit an evidentiary hearing in the district court, which he was denied. "A district court must hold an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'"[48] Valdez's claim is plausible enough that he should be allowed to present evidence regarding (1) why counsel failed to advise him of the cross reference provision and (2) the benefits that counsel erroneously advised Valdez might accrue from his pleading guilty.

These are the reasons why I respectfully dissent.

---

[47] *Lee*, 137 S. Ct. at 1966 (internal quotations removed).
[48] *Rivas-Lopez*, 678 F.3d at 358 (quoting 28 U.S.C. § 2255(b)).